IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| NADIA THORNTON, | * |
| Plaintiff, | * |
| vs. | *   CASE NO. 4:19-cv-128 (CDL) |
| HEALTHCARE STAFFING, INC., | * |
| Defendant. | * |

O R D E R

Plaintiff contends that her former employer violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, by placing her on leave and requiring her to undergo a medical examination to determine whether she was fit for duty. Because Defendant has proffered a legitimate nondiscriminatory reason for taking these actions and Plaintiff has failed to point to evidence creating a genuine fact dispute as to whether these reasons were pretextual, Defendant's pending motion for summary judgment (ECF No. 35) must be granted. The following discussion explains in more detail why.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material*

fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following facts. Defendant is an agency that provides staffing services for organizations such as schools, prisons, clinics, and residential communities that need healthcare workers. Thornton Dep. 11:2-18, ECF No. 35-4. Plaintiff began working for Defendant in June 2016 and, shortly thereafter, Defendant assigned her to work for the Cobb Douglas Community Service Board, a public agency that provided services to children, adolescents, and adults who face behavioral challenges or have intellectual or developmental disabilities. *Id.* at 10:3-11:18. The service board then assigned Plaintiff to be a Client Support Worker II at a facility that housed about 25 women with substance use disorders. *Id.* at 14:20-25, 15:4-6, 38:10-15. In this role, Plaintiff was responsible for transporting residents to various meetings and medical appointments and monitoring medication at the facility.

*Id.* at 13:8-24, 19:11-19, 47:12-48:11. She transported residents in company-owned vehicles, including a 15-passenger van. *Id.* at 40:6-9. Plaintiff's supervisor was Deborah Candies-McKissick, and her human resources contact was Satina Lender. *Id.* at 54:3-13.

Before she began working at the facility, Plaintiff completed a two-week training session hosted by Defendant and the service board. *Id.* at 37:13-38:2. As part of her training, Plaintiff received a copy of an employee handbook from both the service board and Defendant. *Id.* at 40:17-41:5, 42:13-15. Plaintiff acknowledged and signed a form stating that if she was "taking prescription or non-prescription medication that could affect [her] ability to perform [her] job [she] must inform [her] supervisor before starting work." HealthCare Staffing Drug-Free Workplace Educ. Summ., ECF No. 35-6; *see* Thornton Dep. 48:21-49:5. Defendant's medical examinations policy provided that "[e]mployees who need to use prescription or nonprescription legal drugs while at work must report this requirement to their supervisor if the use might impair their ability to perform the job safely. Depending on the circumstances, employees may be reassigned, prohibited from performing certain tasks or prohibited from working if they are determined to be unable to perform their jobs safely while taking prescription or nonprescription legal drugs." HealthCare Staffing Med. Examinations Pol'y ¶ 5, ECF No. 35-8 at 5 (hereinafter "Med. Examinations Pol'y").

This policy further provided that "[e]mployees may be required to have a medical examination on other occasions when the examination is job-related and consistent with business necessity. For example, a medical examination may be required when an employee is exposed to toxic or unhealthful conditions, requests an accommodation for a particular disability, or has a questionable ability to perform essential job functions due to a medical condition." *Id.* ¶ 2. The policy also stated that "[m]edical examinations required by the company will be paid for by the company and will be performed by a physician or licensed medical facility designated or approved by the company." *Id.* ¶ 4.

Plaintiff was aware that Defendant could require her to submit to a random drug test at any time. Thornton Dep. 51:13-19. And she filled out and signed a "Medical and Physical Examination/History Form" that explained that Defendant would use her health information to "determine whether [she] can safely perform the duties of the job for which [she] [is] being considered." Med. & Physical Examination/Hist. Form 1 (June 6, 2016), ECF No. 35-5. On this form, Plaintiff disclosed that she suffered from persistent or severe headaches, wore glasses and contacts, had painful joints, and was allergic to some medications and pollen. *Id.* Plaintiff also disclosed that she had been diagnosed with fibromyalgia. Thornton Dep. 30:17-22.

4

On September 21, 2016, Plaintiff had to visit the emergency room because of severe pain caused by her fibromyalgia. *Id.* 74:23-75:7, 75:19-25. She had almost fallen over and experienced brief paralysis that morning. *Id.* at 75:8-17. She informed Candies-McKissick that she was going to the emergency room because she was not feeling well, but she did not clarify that her visit was related to her fibromyalgia or that she had experienced brief paralysis or extreme pain. *Id.* at 74:5-8. Plaintiff does not recall informing doctors at the emergency room that part of her job involved transporting clients in vehicles. *Id.* at 86:16-25. When she left the hospital, Plaintiff was given pain medication and a work release form stating that she could return to work in two days without any restrictions. *Id.* at 82:17-83:14; *see* Work Release Form (Sept. 21, 2016), ECF No. 40-4 (indicating that Plaintiff could return to work two days from September 21, 2016 with no restrictions).

The next day, on September 22, 2016, Lender, the human resources contact, instructed Plaintiff that she needed to take a random drug test. *Id.* at 79:23-80:10, 89:9-16. Plaintiff told Lender that she had some documentation about her trip to the emergency room, and Lender gave her the drug test paperwork. *Id.* at 89:18-25, 90:9-10. Around 4:00 or 5:00 p.m. that same day, Plaintiff returned to the facility and gave Candies-McKissick an emergency work release form stating that she could return to work

5

without any restrictions. *Id.* at 91:20-22, 92:14-18. Candies-McKissick, however, instructed Plaintiff to gather her things and go home based on instructions from human resources, so Plaintiff left the facility. *Id.* at 93:2-20. Neither party identified any evidence explaining the reason that human resources had directed that Plaintiff go home. After sending Plaintiff home on September 22, Defendant did not schedule her to work again. *Id.* at 162:19-163:2.

On October 7, 2016, Candies-McKissick sent an email to Defendant's human resources department expressing concerns about Plaintiff's medical conditions. Reed Decl. Ex. A, Email from D. Candies-McKissick to S. Ward (Oct. 7, 2016, 11:18 a.m.), ECF No. 35-18 at 6-7. Candies-McKissick explained that Plaintiff had informed her that she might have Multiple Sclerosis ("MS"), which could cause her to pass out and prevent her from doing some tasks, like driving or walking up steps, and that Plaintiff was taking methylprednisolone and Acetaminophen-Hydrocodone. *Id.* Candies-McKissick also reported that Plaintiff had an appointment in November to find out if she had MS. *Id.*

Lender responded to Candies-McKissick's email and noted that Plaintiff had not informed her about the possible MS diagnosis and that she could provide Plaintiff with medical forms that a physician could complete and return so that Lender could determine whether Defendant could provide an accommodation under the ADA.

Email from S. Lender to D. Candies-McKissick (Oct. 7, 2016, 11:52 a.m.), ECF No. 35-18 at 5-6. Lender also noted that she was familiar with the risks associated with MS and that it could be dangerous to the safety of Plaintiff, clients, and others. *Id.* Lender specified that "since she has disclosed some [] medical conditions which could be hazardous to her own safety, we may need her to remain home until we receive findings from her doctor." *Id.* Plaintiff disputes this evidence. She testified that she never told anyone, including Candies-McKissick, that she had MS. Thornton Dep. 101:17-19. She also testified that, when she began working for Defendant, the only medication that she took was 50 milligrams of Topomax. *Id.* at 30:7-15, 31:16-19.

After Candies-McKissick informed Lender about Plaintiff's medical conditions, Lender contacted Defendant's head of human resources, Brittney Campbell, about Plaintiff's condition, and Campbell directed that Plaintiff "not serve in that capacity until she is medically cleared." Email from B. Campbell to S. Lender (Oct. 7, 2016, 5:55 p.m.), ECF No. 35-18 at 5. Four days later, on October 11, Lender sent Plaintiff a "General Release of Information" form that would authorize Plaintiff's physician to release medical information to Defendant to determine her fitness-for-duty. Letter from S. Lender to N. Thornton (Oct. 11, 2016), ECF No. 35-10. Plaintiff did not go see her physician or fill out the form because she thought Defendant had terminated her health

7

insurance on September 22, and she could not afford the $45 co-pay to see her physician. Thornton Dep. 107:16-18, 116:8-20, 140:2-8.

If Defendant had paid for her doctor's appointment, Plaintiff testified that she would have gone to the medical appointment to complete the form. *Id.* at 163:13-16. At some unspecified time, Lender had a "vague conversation" with Thornton in which she discussed Defendant paying for that appointment, but the outcome of that conversation was unclear to Plaintiff. *Id.* at 163:6-12 ("It was a vague conversation about the payment. She was like, well, you could just go. You don't need to have the documentation or payment. You can just go, and then we'll worry about that later."). And, as noted above, Defendant's medical examinations policy explicitly provided that Defendant would pay for any required medical examinations. Med. Examinations Pol'y ¶ 4.

Plaintiff, however, thought that Lender had terminated her employment because she refused to undergo the fitness-for-duty examination, so she sought unemployment benefits with the Georgia Department of Labor sometime in the first few weeks of October 2016. Thornton Dep. 126:1-10. As part of that application process, Plaintiff indicated that Lender had discharged her. *Id.* at 127:7-19. In response to a question that asked, "What did your employer say to you that caused your discharge," Plaintiff responded, "Until I go back to the doctor and submit [to a fitness-

for-duty examination], I cannot come back to work." *Id.* at 128:5-12. The Department of Labor determined that Plaintiff was not eligible for unemployment benefits because she was "still on active status" and had not received a separation notice from Defendant. *Id.* at 130:7-15, 132:18-22; *see* Ga. Dep't of Lab., Claims Exam'r's Determination, ECF No. 35-14 (indicating that Plaintiff was not eligible for unemployment benefits as of October 9, 2016). She was still employed pending the status of a fitness-for-duty test, and she was still receiving income. Thornton Dep. 131:3-22.

Lender emailed Plaintiff on October 17, 2016 asking her to confirm whether she had received the release form and to let her know if Plaintiff had any questions. Email from S. Lender to N. Thornton, (Oct. 17, 2016 10:18 a.m.), ECF No. 35-18 at 8. Later that same day, Lender emailed another employee, Cindy Ackerman, summarizing the situation. Email from S. Lender to C. Ackerman (Oct. 17, 2016, 12:54 p.m.), ECF No. 46-1. Lender explained that Plaintiff had provided her with documentation from the hospital regarding a "diagnosis of 'Brief Paralysis'" and that Plaintiff had spoken to Candies-McKissick about possibly having MS. *Id.* Lender also explained that Plaintiff had an appointment with a neurologist on November 3, 2016 for further evaluation and that she made the decision to place Plaintiff "in an 'inactive' work status" pending the recommendation from her physician. *Id.*

9

On October 26, 2016, Ackerman emailed Lender asking if Defendant was going to pay for the fitness-for-duty exam. Email from C. Ackerman to S. Lender (Oct. 26, 2016, 7:36 p.m.), ECF No. 46-1 at 2. Lender responded that she had emailed the release form to Plaintiff, but Plaintiff had not yet returned the form. Email from S. Linder to C. Ackerman, ECF No. 46-1 at 2. Lender noted that she wanted to send Plaintiff's treating physician information to request a fitness-for-duty examination and that Defendant was not going to pay for the examination at that point. *Id.* She also explained that Plaintiff had filed for unemployment benefits with the Department of Labor. *Id.*

On October 28, 2016, Lender sent Plaintiff an email following up on a previous phone conversation in which Lender acknowledged Plaintiff's verbal resignation from employment. Email from S. Lender to N. Thornton (Oct. 28, 2016), ECF No. 35-8 at 11. Plaintiff responded to this email emphasizing that she had not resigned. Email from N. Thornton to S. Lender (Oct. 28, 2016, 5:09 p.m.), ECF No. 35-18 at 10-11. Plaintiff testified that prior to this email exchange, Lender had threatened that Defendant was going to fire Plaintiff if she did not complete the fitness-for-duty form and that she would not receive unemployment benefits. Thornton Dep. 96:7-22, 109:10-15.

Plaintiff appealed the Department of Labor's determination that she was still employed on October 31, 2016. Appeal Req. Form

10

(Oct. 31, 2016), ECF No. 35-14 at 3. On her appeal form, Plaintiff explained that she disagreed with the Department of Labor's determination and that her human resources manager had informed her that she needed to sign a medical release form and the only way she could obtain a separation notice was by resigning or if Defendant fired her. *Id.* at 4. She also explained that Lender emailed her a resignation notice, but Plaintiff had not agreed to resign. *Id.*

Defendant paid Plaintiff $461.61 for a pay period from September 18, 2016 to October 1. Reed Dec. Ex. B, N. Thornton Earnings Summ. (Oct. 7 & 24, 2016), ECF No. 35-18 at 13-14. For a pay period from October 2, 2016 to October 15, Defendant paid Plaintiff $444.25. *Id.* at 14. Her last day of employment was October 15, 2016. Both earnings summaries for these pay periods include a line item for "Medical Gold" of $108.71 and, under a section titled "Employer Paid Benefits," a line item for "Employer Paid Medical" of $166.79. *Id.* at 13-14.

DISCUSSION

Plaintiff alleges that Defendant discriminated against her by placing her on leave and not allowing her to return to work because of her disability of fibromyalgia and perceived disability of MS.[1]

---

[1] Plaintiff's complaint also alleges that Defendant discriminated against her by not applying its progressive discipline policy and by terminating her. But she does not address those claims in her response to Defendant's motion for summary judgment, so they are abandoned. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged

11

"The ADA provides that covered employers shall not discriminate against qualified individuals with a disability on the basis of that disability." *Jones v. Aaron's Inc.*, 748 F. App'x 907, 914 (11th Cir. 2018) (per curiam); *see Carruthers v. BSA Advert., Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004) (per curiam) ("Under the 'regarded as' prong [of the ADA], a person is 'disabled' if her employer perceives her as having an ADA-qualifying disability, even if there is no factual basis for that perception.").

"In the absence of direct evidence of discrimination, [courts] apply the burden-shifting framework established by the Supreme Court in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] to ADA discrimination claims." *Jones*, 748 F. App'x at 914 (footnote omitted). Under this framework, Plaintiff must establish a prima facie case of ADA discrimination, and if she does, the burden of production shifts to Defendant to demonstrate a legitimate, nondiscriminatory reason for its conduct. *Id.* If Defendant meets this burden, then Plaintiff must show that Defendant's proferred rationale was pretext for discrimination.

---

in the complaint but not relied upon in summary judgment are deemed abandoned."). The Court also notes that, for the first time in her response to Defendant's motion for summary judgment, Plaintiff asserts that Defendant discriminated against her by requiring a fitness-for-duty examination. But Plaintiff's complaint does not allege any facts or claims based on the fitness-for-duty examination. *See generally* Compl., ECF No. 1. "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam). As such, the Court only considers claims alleged in Plaintiff's complaint and addressed in her response to Defendant's motion for summary judgment.

*Id.* To establish a prima facie case of discrimination, Plaintiff must show that she was disabled, a "qualified individual" under the ADA, and discriminated against based on her disability. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

Pretermitting whether Plaintiff has established a prima facie case, Defendant has clearly articulated a legitimate, nondiscriminatory reason for placing Plaintiff on leave. Requiring an employee to undergo a medical examination for job-related purposes and business necessity and placing that employee on leave pending the outcome of the examination, as Defendant did here, does not violate the ADA. *See* 42 U.S.C. § 12112(d)(4)(A); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311 (11th Cir. 2013) (finding an employer did not violate the ADA by requiring an employee to undergo a psychiatric evaluation as a condition to continued employment and placing him on leave pending that evaluation process); *Williams v. Motorola, Inc.,* 303 F.3d 1284, 1291 (11th Cir. 2002) (noting that an employer's concerns about an employee's threatening behavior could have justified requiring a medical examination); *Watson v. City of Miami Beach*, 177 F.3d 932, 935-36 (11th Cir. 1999) (determining that requiring a police officer to undergo a fitness-for-duty examination and a tuberculosis examination did not violate 42 U.S.C. § 12112(d)(4)(A)); *Lyons v. Miami Dade Cnty. Fire Rescue Dep't*, 470 F. App'x 801, 803-04 (11th Cir. 2012) (per curiam) (finding an

employee's refusal to submit medical information in a fitness-for-duty evaluation constituted a legitimate reason for termination and the "fitness evaluation was indisputably related to a legitimate concern of the [employer] about whether [the employee] could perform her job-related duties").

It is undisputed that Defendant's medical examination policy tracks the ADA and specifies that Defendant could require an employee to undergo a medical examination if he or she had "a questionable ability to perform essential job functions due to a medical condition." Med. Examinations Pol'y ¶ 2. One of the essential functions of Plaintiff's job required her to operate company vehicles, including a 15-passenger van, while transporting clients to meetings and appointments. Aware of Plaintiff's recent visit to the emergency room after she experienced brief paralysis resulting from fibromyalgia, Defendant had a sufficient basis for requiring Plaintiff to submit to a medical examination. And a desire and responsibility to protect the safety of Plaintiff and her passengers certainly qualifies as a legitimate and nondiscriminatory reason for placing Plaintiff on leave pending the outcome of a fitness-for-duty examination. Thus, Defendant has carried its initial burden, and to avoid summary judgment, Plaintiff must point to evidence that creates a genuine fact dispute as to whether Defendant's reasons for the actions it took were actually pretext for unlawful discrimination. *See Chapman v.*

*AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proferred nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proferred reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."); *see also Vaughn v. FedEx Freight, Inc.*, 824 F. App'x 797, 801, 804-05 (11th Cir. 2020) (per curiam) (plaintiff failed to cite any evidence of pretext where employer disqualified him from working as a truck driver after he attempted to commit suicide despite his own physician clearing him to return to work without restrictions).

Plaintiff points to the following evidence of pretext: (1) she disputes that she ever told anyone, including Candies-McKissick, that she had MS; (2) she presented a work release form from a doctor after her emergency room visit indicating that she could return to work without any restrictions;[2] and (3) Defendant terminated her health insurance which prevented her from completing the medical examination that Defendant requested.

---

[2] Plaintiff also cites a "Work/School Physician's Release" from a visit to Midtown Neurology that was signed on September 9, 2015. She argues that this document also cleared her to return to work without restrictions. But this document predates Plaintiff's bout of brief paralysis and Defendant's MS-related concerns, so it does not create a fact dispute on Defendant's motivation for placing Plaintiff on leave in 2016.

15

Plaintiff misunderstands the nature of her burden to produce evidence of pretext. The evidence must support a reasonable conclusion that the reasons Defendant proffered for its decision were not the true reasons but were manufactured as pretext for discrimination. None of the evidence that Plaintiff relies upon rebuts the undisputed evidence that Defendant placed Plaintiff on leave because of safety concerns. Even if Candies-McKissick and Lender were mistaken about Plaintiff potentially having MS, "an employer's mistaken belief is insufficient to establish pretext." *Vaughn*, 824 F. App'x at 803. Moreover, even if Candies-McKissick had never reported that Plaintiff might have MS, Defendant would have still been justified in placing Plaintiff on leave because it knew that she had recently visited the emergency room after experiencing brief paralysis, a condition that would legitimately concern any employer whose employees operated vehicles. Along these same lines, although Plaintiff presented a release form from the hospital stating that she could return to work without restrictions, it was not unreasonable, much less discriminatory, for Defendant to place Plaintiff on leave pending another medical examination to determine if it would be safe for her to continue operating a vehicle to transport clients. *See id.* at 801, 803 (finding no pretext even though employee's personal physician cleared him to return to work without restrictions). Given the uncertainty about Plaintiff's medical condition, any reasonable

employer would be motivated by safety concerns under these circumstances. And Plaintiff has pointed to no evidence suggesting that these legitimate reasons for its actions were pretextual.

The termination of Plaintiff's health insurance likewise does not rescue her from her burden of producing evidence of pretext. The Court first observes that the evidence in the record indicates that Plaintiff had health insurance through at least October 15. *See* Norton Earnings Summ. (Oct. 7 & 24, 2016). Furthermore, even if the termination of her health insurance made it difficult, or even financially impossible, for her to obtain the fitness-for-duty examination, that termination does not demonstrate that Defendant placed her on leave because of discriminatory reasons rather than legitimate safety concerns consistent with its nondiscriminatory policies. Perceived unfairness does not equate to pretext for unlawful discrimination.

Simply put, Defendant claims that it had concerns about Plaintiff's ability to safely perform her job and placed her on leave until it could be reassured by a fitness-for-duty medical examination as authorized by Defendant's nondiscriminatory employment policies. Plaintiff has failed to point to evidence from which a reasonable jury could conclude that Defendant's reasons for placing Plaintiff on leave were pretext for unlawful discrimination. And Plaintiff has otherwise failed to point to

evidence that Defendant discriminated against her.  Accordingly, Plaintiff's claim cannot survive summary judgment.

CONCLUSION

Defendant's motion for summary judgment (ECF No. 35) is granted.

IT IS SO ORDERED, this 12th day of July, 2021.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA